Julius J. Tihay, as Executor of the Estate of Julia Tihay, Deceased, Plaintiff-Appellant, v. Aurora City Lines, a Corporation, and Sylvia M. Taccki, Defendants-Appellees.

Gen. No. 66–65.

Second District.

January 18, 1967.

Reid, Ochsenschlager, Murphy and Hupp, of Aurora, for appellant.

Alschuler, Putnam, McWethy, Weiss & Weiler, and Matthews, Jordan, Dean and Suhler, all of Aurora, for appellees.

MR. JUSTICE DAVIS delivered the opinion of the court.

Julius J. Tihay, as Executor of the Estate of Julia Tihay, deceased, herein called plaintiff, sued the Aurora City Lines, herein called Aurora, and Sylvia M. Taccki, herein called Taccki, to recover for the wrongful death

of Julia Tihay. The jury returned a verdict in favor of both defendants; the trial court denied plaintiff's motion for a new trial and entered judgment on the verdict; and the plaintiff appealed. The sole issue raised by plaintiff on review is that the verdict of the jury was contrary to the manifest weight of the evidence.

The collision occurred at approximately 3:30 p. m., in March, 1965. The weather and road conditions were good. The decedent was a guest passenger in the car driven by Taccki, who was allegedly guilty of wilful and wanton misconduct. Aurora was charged with ordinary negligence. It is conceded that the decedent died of the injuries sustained in the collision between Taccki's car and Aurora's bus and that there was no contributory negligence or wilful and wanton misconduct on the part of the decedent.

In her testimony, Taccki stated that she and the decedent (her aunt) had spent the day in Chicago. They had just left the home of Taccki's sister, which was about four or five blocks from the place of the collision. The decedent was sitting in the right front seat. Taccki was driving west on Grove Street towards its intersection with Beach Street. She was very familiar with the general neighborhood and the particular intersection of Grove and Beach Streets.

Taccki testified that her top speed from the time she left her sister's house was fifteen to twenty miles per hour; that she was driving slowly and carefully because children were coming out of school at this hour and were running all over the street; that as she came to the intersection of Grove and Beach she stopped her car and first looked to her left—south on Beach Street; that there was no traffic coming; that she then looked to her right—north on Beach Street—and saw the bus approaching from that direction; and that the bus was then about a block away and she was stopped at the curb line of the intersection.

She testified that she then proceeded through the intersection at a "normal speed"—possibly ten to fifteen miles per hour—on the proper side of the street; that she next saw the bus, coming very fast, when she was at about the middle of the intersection; that she then accelerated to try to get out of the intersection and knew that if she didn't, the bus would hit her; that during all of this time she was in the right hand, westbound lane; and that she was nearly out of the intersection, toward the westerly curb line of Beach Street, when she saw the bus turn right and hit her.

She further testified that her car was in good working condition; that the bus struck it near the right front door and the left headlight of the bus came through such door and into the car; that the bus pushed her car up over the southwest curb of the intersection; and that nothing obstructed her view to either the south or the north as she was stopped at the intersection.

The bus driver testified that he was driving a school bus, had picked up a number of children at a school and had just dropped a child off one block north of the intersection where the collision occurred and where he had turned onto Beach Street; and that he was then proceeding south on Beach Street toward the intersection of Beach and Grove.

He stated that he first saw the Taccki car when he was about at the intersection. The Taccki car was then about through the north-south crosswalk on the east side of the intersection. The bus was then at the north edge of the east-west crosswalk on the north side of the intersection. The car was thus about the width of the crosswalk nearer the intersection. The bus driver testified that his speed at this time was approximately fifteen to twenty miles per hour; that the Taccki car was then travelling approximately twenty-five miles per hour; and that from the time he first observed the car it started to speed up—increasing its speed by five miles per hour

or slightly more—and began to leave its proper lane and move to the south and into the eastbound lane of Grove Street.

He also testified that the impact occurred in the southwest quarter of the intersection and that the Taccki car was going approximately thirty miles per hour when it was struck. Prior to the collision he heard no horns or the sound of brakes. The Taccki vehicle was pushed about halfway over the curbing at the southwest corner of the intersection. The left front of the bus hit the right door of the car. He estimated the weight of the bus to be about 15,000 pounds.

Three of the children who were passengers on the bus were called as witnesses. Each testified, in substance, that the bus was going less than twenty miles per hour as it approached the intersection. However, on a prior occasion, each had given a different, and higher, estimate of the speed of the bus. Each testified that the Taccki car was going faster than the bus. One testified that the bus driver tried to stop and turn the corner and that the driver of the car appeared to make no effort to stop.

One of the investigating police officers was called to testify. A diagram of the intersection, which he had prepared—together with measurements of the street widths, skid marks, locations of the vehicles and general characteristics of the area—was admitted in evidence. He testified that the speed limit in the area was thirty miles per hour; and that the houses in this neighborhood were closer to the corners than in the newer neighborhoods—a factor which was more vividly portrayed by the photographs which were admitted in evidence. These illustrated, better than words, that the house located on the northeast corner of the intersection—the corner between the two approaching vehicles—obstructed the view of the approaching vehicles until each was quite near the intersection itself.

■■ We may not disturb the verdict of the jury as being contrary to the manifest weight of the evidence unless it is clearly evident from a consideration of all of the evidence that an opposite conclusion should have been reached. Payne v. Kingsley, 59 Ill App2d 245, 249, 207 NE2d 177 (1965); Brown v. Boyles, 27 Ill App2d 114, 124, 169 NE2d 273 (1960). Stated differently, we may substitute our judgment for that of the jury only where the latter's verdict is palpably erroneous and wholly unwarranted from the manifest weight of the evidence. Johnson v. Central Tile & Terrazzo Co., 59 Ill App2d 262, 274, 207 NE2d 160 (1965); Wright v. Callaghan, 50 Ill App2d 157, 163, 164, 200 NE2d 56 (1964).

■ In passing on the question before this court, we must consider not only all of the evidence and the verdict of the jury, but also the trial court's denial of a motion for a new trial. Johnson v. Central Tile & Terrazzo Co., supra, page 273; Vasic v. Chicago Transit Authority, 33 Ill App2d 11, 11e, 180 NE2d 347 (1961); Mokrzycki v. Olson Rug Co., 28 Ill App2d 117, 124, 170 NE2d 635 (1960).

■ "It requires much more for this court to set aside a verdict and judgment than is required of the trial judge. It is his duty to set aside the verdict if he is of the opinion that the plaintiff has not sustained his case by a preponderance of the evidence, while the question of the preponderance of the evidence does not arise at all in this court." Morella v. Melrose Park Cab Co., 65 Ill App2d 175, 182, 183, 212 NE2d 106 (1965); Read v. Cummings, 324 Ill App 607, 610, 59 NE2d 325 (1945). Thus, the trial judge, in passing upon the motion for a new trial, is afforded greater latitude than this court. Morella v. Melrose Park Cab Co., supra, 181; Payne v. Kingsley, supra, 252. We may not disturb a verdict unless the verdict and judgment are contrary to the manifest weight of the evidence.

■ ■ The trial judge, like the jury, was in a much better position than this court to weigh the evidence. They both had the benefit of seeing and hearing the witnesses. They saw the calm or disturbed state of the witness and noted the flush or pallor of the face in connection with the answer to certain questions. They heard the delayed and uncertain answer, as well as detected the faltering voice and its inflection, and noted the nuance and denouement attributable thereto, along with the numerous other characteristics of the witnesses which do not appear in the printed record before us. Consequently, the trial judge is afforded discretion in the allowance or refusal of a motion for new trial, and his decision in this regard will not be reversed except for a clear abuse of such discretion. Buer v. Hamilton, 48 Ill App2d 171, 174, 199 NE2d 256 (1964); Potter v. Ace Auto Parts & Wreckers, Inc., 49 Ill App2d 354, 356, 199 NE2d 618 (1964).

There is substantial conflict on many of the material facts in this case: Did the Taccki car stop at the intersection or was it approaching at a faster rate of speed than the bus? Did Taccki see the bus when it was almost a block away? Did the Taccki car and the bus approach the intersection at approximately the same time, with the bus travelling at a slower rate of speed? Would the bus driver have been justified in assuming that Taccki would yield the right-of-way to him, rather than speed up, as he was approaching from the right and had the directional right-of-way? Did Taccki misjudge the distance or speed of the bus? Did she commit an error of judgment in deciding to speed up, rather than to stop, when she saw the bus? What factor did the proximity of the house, which was on the northeast corner between the two approaching vehicles, play in the resulting collision? Were each of the parties travelling at a safe rate of

speed and maintaining a proper lookout in view of the proximity of this house?

■ ■ The answers to these questions are found in the facts of this case, and it was within the province of the jury to determine the inferences and conclusions to be drawn therefrom. The weight to be given the testimony of the children—each of whom had made some prior inconsistent statements—and the weight to be given the testimony of each driver—who had an interest in the case at least to the extent of feeling a moral responsibility or absence of it for the death which resulted—were matters which the twelve jurors, who were chosen to decide the factual questions, could determine from their actual ob- servations with much greater accuracy than we can attain from a careful examination of the printed record.

Were it for us to make the original decision, we would find it difficult to believe that Taccki stopped her car at the intersection crosswalk and observed the bus approx- imately one block to the north, yet was struck when she pulled out. We find it much more reasonable to accept the testimony that both vehicles approached the intersection at approximately the same time, and that the car acceler- ated rather than braked; that the bus driver swerved to the right, perhaps assuming that the car was going to stop rather than accelerate; and that the driver of the car accelerated, perhaps assuming the bus would either stop sooner or turn to the left, rather than to the right. Such projection of the occurrence would be our guess or con- jecture based on the facts set forth in the record. How- ever, the jury saw and heard the witnesses and we can only surmise what facts, conclusions and inferences it may have relied upon in reaching its verdict.

The significant point is that, tested by the standards we have set forth, we cannot say that the verdict of the jury was such that we must reverse and award a new trial. There was sufficient evidence for the jury to determine

that the bus driver was not negligent. Also, there was ample evidence for it to determine that Taccki was not guilty of wilful and wanton misconduct—the standard by which she had to be judged.

 As has been said time and again, we are not free to set aside the jury's verdict merely because the jury could have drawn different inferences or conclusions —those which we might feel are more reasonable—or because we would have reached a different conclusion had we been the trier of facts. Kahn v. James Burton Co., 5 Ill2d 614, 623, 126 NE2d 836 (1955); Morella v. Melrose Park Cab Co., supra, page 183; Buer v. Hamilton, supra, page 175. Upon the conflicting versions of the facts in this case, it was peculiarly within the province of the jury to determine whether the bus driver was negligent and whether Taccki was guilty of wilful and wanton misconduct. Turner v. Seyfert, 44 Ill App2d 281, 286, 287, 194 NE2d 529 (1963); Layton v. Ogonoski, 256 Ill App 461, 468 (1930).

We have carefully reviewed the entire record in this case and cannot say that the verdict of the jury was contrary to the manifest weight of the evidence; and accordingly, the judgment entered thereon is affirmed.

Judgment affirmed.

ABRAHAMSON and SEIDENFELD, JJ., concur.